## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:13CR0087 CDP/TCM |
| | ) | |
| FRANCIS NDEGWA NYAGA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This matter is before the Court on the motions of Francis Ndegwa Nyaga ("Defendant") to suppress and to dismiss. An evidentiary hearing was held on May 6, 2013, at which Defendant, represented by Sarah K. Molina, appeared and produced the testimony of Suzanne Brown, an attorney. The Government, represented by Assistant United States Attorney Noelle C. Collins, produced the testimony of Immigration and Customs Enforcement ("ICE") Special Agent Jeffrey M. Othic. Government's exhibits 1A, 1B, 1C, 2A, and 2B were admitted into evidence. Defendant's exhibits H, Q, S, and T were admitted into evidence.

Based upon the evidence adduced at the evidentiary hearing and the applicable law, the undersigned finds and concludes as follows.

## Background

1.    Special Agent Othic is in the Homeland Security Investigations ("HSI") division of ICE. As such, he has criminal and civil case responsibilities. In criminal cases, he investigates immigration violations, forged immigration documents, child pornography, and the illegal use of guns and drugs. On the civil side, he enforces the Immigration and

Naturalization Act by removing individuals who are in the United States without status. These responsibilities often overlap in the same case.

2. In February 2011, Federal Bureau of Investigation ("FBI") Special Agent Hannah Mayer contacted Special Agent Othic to assist her in investigating Defendant in a possible human trafficking case. This request was not unusual because in many instances these cases involve foreign nationals. The investigation revealed that Defendant's former wife signed a contract with Defendant and Defendant's relative by which money the wife earned would go directly to Defendant or his relative. There was also an allegation Defendant had abused his now-former wife. Special Agent Mayer was the lead agent in the ongoing investigation.

3. For the next several months, Special Agent Othic's work on the case consisted of database checks on Defendant to learn of any immigration updates on him and to attempt to locate his whereabouts. The FBI interviewed Defendant's spouse who, like Defendant, was a Kenyan national. Because of the human trafficking allegations, the FBI believed that there was a public safety issue. Special Agent Othic suspected Defendant was out of status in the United States based on the database information. In Special Agent Othic's experience, however, the data on the computer was sometimes stale and he would learn after interviewing a suspected illegal alien that he or she did, in fact, have legal immigration status in the United States. Consequently, Special Agent Othic wanted to talk to Defendant about his status. He knew that, at one time, Defendant had a visitor status, which had been extended and then changed to a student status. Under a student status, Defendant was not allowed to work in the United States.

4.     Special Agent Othic believed, based on his investigation of a vehicle registration, that Defendant was living in Moline Acres, Missouri. On April 25, 2012, Special Agent Othic and another agent in his office set up surveillance on the vehicle in question in an apartment parking lot. Prior to this surveillance, Special Agent Othic notified the Moline Acres police about his investigation and the potential stakeout. At approximately 7:15 a.m. or later, Defendant was seen walking to his vehicle. Special Agent Othic approached Defendant, identified himself as a federal police officer, and asked to speak with him. Defendant agreed to talk with Special Agent Othic, was cooperative, and understood the conversation.[1] Defendant admitted to Special Agent Othic that he was without legal status and was in the country illegally. He was no longer a student and was working delivering auto parts. Special Agent Othic requested Defendant's passport and detained Defendant on suspicion of violations of the immigration laws. Defendant stated that his passport was in his apartment and gave verbal permission to Special Agent Othic to enter his apartment and retrieve the document. Defendant used a key for the secured elevator to his apartment and a key to his seventh floor apartment. Special Agent Othic and another agent conducted a protective sweep of the apartment for their safety; there was no other occupant in the apartment. Defendant directed the agents to his bedroom/office and to a black bag containing documents. Defendant produced the passport and other documents to the two agents. Special Agent Othic then requested permission to search Defendant's apartment due to the large volume of documents and papers in Defendant's bedroom/office. Defendant voluntarily provided verbal consent to search his apartment and, at 7:49 a.m., voluntarily signed a Consent to Search form that included both his apartment and his vehicle. (Gov. Ex.

---

[1]There is no evidence that Defendant did not understand or speak English.

2A.)  There is no evidence of force, coercion, threats, or promises made to Defendant to gain his consent.  And, he understood the consent form.  It is not uncommon to search an illegal alien's residence after the alien has been identified and has been administratively detained, as in the instant case.

5.      Documents were seized from Defendant's apartment and vehicle, including work-related documents.  The search took approximately ten to twenty minutes.  Special Agent Othic testified that this was not a full-blown search of a residence where drawers and cabinets are emptied, but rather was a collection of documents that Defendant had around his apartment and in his vehicle.  Defendant was handcuffed and transported to HSI offices.  At the offices, Special Agent Othic reviewed the documents that he had seized from Defendant's apartment.  Included in the documents was a resident alien card in a binder; the card stated that Defendant was from South Africa.  Special Agent Othic knew Defendant did not have this type of United States status and also knew that Defendant was from the country of Kenya.  This is the first time Special Agent Othic knew Defendant was in possession of a forged or counterfeit resident alien card.  Special Agent Othic contacted Special Agent Mayer and invited her to participate in Defendant's interview because of the pending human trafficking investigation.   This is not uncommon when civil and criminal cases are simultaneously ongoing.  Defendant, read, understood, and voluntarily signed a Notice of Rights form relating to his potential deportation issues.  (See Gov. Ex. 1A.)  The form related to Defendant's civil removal proceedings.

6.      Defendant was also provided *Miranda*[2] warnings due to the human trafficking investigation.  A Statement of Rights form, including these warnings, was read to and by

---

[2]**Miranda v. Arizona**, 384 U.S. 436 (1966).

Defendant. He signed the form. (See Gov. Ex. 1B.[3]) There is no evidence of threats, force, coercion, or promises made to Defendant to secure his signature. Defendant voluntarily made a statement.

7.     Special Agent Othic was never the lead case agent in this matter. He was asked to assist the FBI in their investigation. Special Agent Mayer subsequently became pregnant and required bed rest after Defendant's April 25, 2012, interview. Defendant's former wife was allowed to remain in the United States during the instant investigation; this procedure is not uncommon in cases where the potential complaining witness is also out of United States status. Special Agent Othic strongly believed that Defendant was out of status prior to his April 25, 2012, detention. But, as described above, he wished to confirm these facts prior to any civil arrest or immigration charges. Defendant was arrested without a warrant. A warrant was eventually issued on April 26, 2012, and served on Defendant the next day. (Def. Ex. H.) Defendant's removal proceeding file, see Defendant Exhibit Q, included a Notice to Rights that advised him of more rights than had the Notification of Rights form. (See Gov. Ex. 1A.)

8.     Defendant had two immigration hearings scheduled: a bond hearing and a master calendar hearing. The Bond Determination Checklist completed for Defendant is in the certified copy of Defendant's alien file from Kansas City. (Def. Ex. U.) Exhibit U was never introduced into evidence, but Defendant's Bond Determination Checklist was identified in Court and it resembled the form identified as Defendant exhibit L.[4] Defendant received

---

[3]Government exhibits 1C and 2B are consent forms in Spanish that were not used in the investigation of this case.

[4]The Court excluded Defendant's exhibit L which is a bond check list from an individual other than Defendant.

a downgrade in points for domestic violation, and a bond of $13,000.00 was originally recommended. That amount was crossed out and "no bond" was written on the form along with the notice that federal prosecution was pending. Defendant's immigration judge set a bond of $3,000.00 for Defendant. He was released after a May 24, 2012, bond hearing. Special Agent Othic's signature appears on the bond checklist.

9.     Defendant's exhibits S and T are ICE memoranda relating to detention procedures and prosecution discretion issues. The bond hearing in this matter had nothing to do with HSI.

10.     The record is not clear on Defendant's marital status while the investigation was pending. There is evidence that he was married, but Special Agent Othic testified that Defendant never mentioned that he was married during his interview and none of the documents seized from either Defendant's apartment or vehicle related to a certificate of marriage. There was an e-mail from Ms. Brown to Special Agent Othic requesting that documents relating to Defendant's marriage be returned to her, but Special Agent Othic believed that this request involved a previous marriage/divorce. The FBI's human trafficking investigation did not result in any such charges against Defendant.

11.     Special Agent Othic testified that there was no collusion or ruse created to keep Defendant confined on civil immigration matters while a criminal investigation proceeded. He further testified that it is common for criminal and civil investigations to be concurrent as occurred herein.

## Discussion

**A.     Defendant's Motion to Suppress Evidence** [Doc. 24]

The evidence is undisputed that Defendant was arrested on the civil immigration related charges and that he then voluntarily consented, verbally and in writing, to the search of his apartment and vehicle. Defendant signed a Consent to Search form at his apartment, understood the consent concept, and was cooperative. There is no evidence of force, threats, coercion, or promises made to Defendant to secure his consent. He voluntarily escorted the agents into a secure elevator to the seventh floor and opened his apartment door with his key. He then escorted the agents to the bedroom/office where he retrieved the bag containing many documents relating to his immigration status. The office area of Defendant's bedroom was filled with documents and Special Agent Othic requested permission to search Defendant's apartment. After Defendant voluntarily signed the Consent to Search form, a search was conducted of his apartment and vehicle, resulting in the seizure of documents.

An immigration official has the power to arrest any alien in the United States without a warrant "'if he has reason to believe that the alien so arrested is in the United States in violation of any such [immigration] law or regulation and likely to escape before a warrant can be obtained for his arrest . . . .'" **United States v. Chavez**, 705 F.3d 381, 383-84 (8th Cir. 2013) (quoting 8 U.S.C. § 1357(a)(2)). "'Reason to believe' requires the official to have probable cause that the person is in the United States illegally." **Id.** (citing United States v. Quintana, 623 F.2d 1237, 1239 (8th Cir. 2010)). Here, Defendant advised Special Agent Othic in the apartment parking lot that he was in the United States illegally and was no longer a student. Special Agent Othic made a civil arrest under section 1357(a)(2).

Special Agent Othic requested permission to search Defendant's apartment and vehicle. Defendant voluntarily gave him permission. Because Special Agent Othic's request to search Defendant's apartment and vehicle did not violate the Fourth Amendment, the fruits

of that search need not be suppressed as long as Defendant voluntarily consented to the search. See e.g., **United States v. Miller**, 20 F.3d 926, 930 (8th Cir. 1994). It is the Government's burden to prove by a preponderance of the evidence that Defendant did so. **United States v. White**, 81 F.3d 775, 780 (8th Cir. 1996) (citing Miller, 20 F.3d at 930). In determining whether this burden has been met, the Court must examine both the characteristics of the accused and the details of the environment in which the consent was given. **Id.** (citing United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990)). "The following characteristics of persons giving consent are relevant when assessing the voluntariness of their consent: (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system." **Chaidez**, 906 F.2d at 381 (interim citations omitted). "In examining the environment in which consent was given, courts should also ask whether the person who consented: (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or secluded place; or (6) either objected to the search or stood silently by while the search occurred." **Id.** (interim citations omitted). The foregoing facts "should not be applied mechanically 'because '[t]he concept of reasonable suspicion, like probable cause, is not readily, or even usefully, reduced to a neat set of legal rules.'" **Id.** (quoting United States v. Sokolow, 490 U.S. 4, 7 (1989)) (alteration in original).

In the instant case, the agents first conducted a protective sweep of Defendant's apartment for their safety and to make sure no one else was in the apartment. Incident to an in-house arrest, law enforcement officers can, "as a precautionary matter and without probable cause or reasonable suspicion," conduct a protective sweep of the area "immediately adjoining the place of arrest from which an attack could be immediately launched." **Maryland v. Buie**, 494 U.S. 325, 334 (1990). There must, however, be "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." **Id.** Such a sweep must not be a full search of the premises, "but may extend only to a cursory inspection of those spaces where a person may be found." **Id.** at 335. See e.g. **United States v. Cunningham**, 133 F.3d 1070, 1072 (8th Cir. 1998) (affirming seizure of evidence pursuant to protective sweep of apartment following defendant's arrest); **United States v. Vance**, 53 F.3d 220, 221 (8th Cir. 1995) (affirming seizure of marijuana found in plain view by officer who had entered defendant's house to conduct protective sweep on grounds that officer could reasonably have believed that such a sweep was necessary for his and other's safety).

Defendant never objected to the search nor made any demands to limit its scope. Defendant verbally and in writing consented to the search. There is nothing in the record to suggest that consideration of the relevant characteristics favor a finding that the consent was not voluntary.

Defendant's motion to suppress evidence should be DENIED.

B.     **Defendant's First Motion to Dismiss** [Doc. 25]

Defendant moves to dismiss the indictment on the grounds that 18 U.S.C. § 3161(b) of the Speedy Trial Act was violated because he was not indicted within thirty days of his April 25, 2012, arrest by Special Agent Othic. Section 3161(b) provides that an information on indictment shall be filed within thirty days from the date an individual was arrested. Id. If that thirty-day time limit is violated, "such charge against that individual contained in such complaint shall be dismissed or otherwise dropped." 18 U.S.C. § 3162(a)(1). Defendant however, was not charged by criminal complaint; rather, he was arrested for violating the immigration laws of the United States. Immigration proceedings are civil. **Chavez**, 705 F.3d at 384. Therefore, immigration deportation proceedings do not implicate the Speedy Trial Act.[5] See **United States v. Perez-Perez**, 337 F.3d 990, 997 (8th Cir. 2003); **United States v. Grajales-Montoya**, 117 F.3d 356, 366 (8th Cir. 1997). Additionally, "the term 'arrest' used in § 3161(b) of the [Speedy Trial] Act must be construed as an arrest where the person is charged with an offense." **United States v. Jones**, 676 F.2d 327, 331 (8th Cir. 1982). The Speedy Trial Act defines "offense" as a criminal offense. See 18 U.S.C. § 3172(2); **United States v. Dyer**, 325 F.3d 464, 468 (3rd Cir. 2003).

It is clear that Defendant was arrested on April 25, 2012, on immigration deportation issues after having admitted that he was out of United States status. Defendant was indicted in the instant charge – knowingly possessing a counterfeit permanent resident card in violation of 18 U.S.C. § 1546(a) – on March 7, 2013. This criminal charge stems from the counterfeit card Special Agent Othic found in Defendant's papers after Defendant was

---

[5]Moreover, civil deportation proceedings do not trigger the Rules of Criminal Procedure, including Rule 5(a). See **Chavez**, 705 F.3d at 384.

transported to the HSI offices following the search of his apartment. Defendant concedes that because his deportation was a civil matter, the Speedy Trial Act does not apply unless a ruse or collusion exists by which he was detained on immigration charges for the purposes of preparing a criminal prosecution. In support of this argument, Defendant cites **Grajales-Montoya**, 117 F.3d at 366-67. In that case, the defendant was arrested on September 23, 1994, for entering the United States illegally and turned over to the Immigration and Naturalization Services ("INS") for deportation proceedings. **Id.** at 366. While defendant was awaiting deportation proceedings, federal agents obtained a material witness warrant against him because they believed that he was also involved in illegally trafficking drugs. **Id.** When in federal custody, but not in INS custody, the defendant twice testified before a grand jury about the illegal drug allegations. **Id.** He was then returned to INS custody and twice appeared before an immigration judge. **Id.** After the second hearing, INS issued a new warrant, pursuant to which he remained in INS custody until being indicted the following month for perjury. **Id.** Two months after that, the perjury indictment was dismissed and he was indicted on the charges at issue. **Id.** Citing the Speedy Trial Act's mandate that an indictment be brought within thirty days of an arrest on a federal criminal charge, see 18 U.S.C. § 3161(b), the defendant moved to dismiss the indictment, arguing that his immigration arrest was really an arrest for the drug trafficking charges and that the INS detention was a ruse to detain him for later prosecution for those drug charges. **Id.** The Eighth Circuit disagreed, holding that INS had their own reasons to arrest the defendant and there was no evidence of collusion or of a ruse to evade the Speedy Trial Act. **Id.**

"Under the ruse exception, a civil detention triggers the Speedy Trial Act's time limit when federal criminal officials collude with civil authorities to detain an individual pending criminal charges, such that the primary or exclusive purpose of civil detention is to hold the individual for future prosecution." **Dyer**, 325 F.3d at 468.  However, "the Speedy Trial Act's time limit is not triggered by the fact that the [ICE] is conducting a reasonable investigation in order to decide whether the individual should be prosecuted or deported without prosecution." **Id.**  For instance, in **United States v. Rodriquez-Amaya**, 521 F.3d 437 (4th Cir. 2008), the defendant was previously convicted of sexual battery in the state of Virginia, was deported, had entered the United States again, and was administratively arrested on May 17, 2005, for deportation.  **Id.** at 439.  The next month, on June 6, he was transferred from ICE to Virginia for prosecution on state-law charges of failing to register as a sexual offender.  **Id.**  The following month, on July 21, a criminal complaint was issued against him for illegal re-entry into the United States.  **Id.**  He was returned to ICE custody in October 2005; was arrested later that month on the federal criminal complaint; and was indicted on November 23, 2005, for unlawful re-entry.  **Id.**  He sought the dismissal of the indictment on the grounds that a ruse/collusion between the agencies triggered the Speedy Trial Act. **Id.** at 441.  Following a hearing in which the agents testified that there was no collusion, the district court found no such ruse.  **Id.** at 442.  The appellate court affirmed, holding that the defendant had failed to carry his burden of proving that his ICE detention "was for the primary or exclusive purpose of future criminal investigation." **Id.**  See **United States v. El-Alamin**, 574 F.3d 915, 922 (8th Cir. 2009) ("A defendant has the burden of proof to show that his statutory right to a speedy trial has been violated.") (internal quotations omitted).

Here, Defendant has not met his burden.  Special Agent Othic testified that there was no collusion, and the Court finds that testimony to be credible.  He also testified that cases such as this often mix civil and criminal prosecutions.  When Defendant was originally detained for not having a proper United States status, Special Agent Othic had no knowledge of a counterfeit permanent resident card, the charge on which Defendant was ultimately indicted.  During that original investigation, Special Agent Othic was brought into the mix to assist the FBI in its human trafficking case.  He was never the lead investigator in that case.  Moreover, when Special Agent Othic detained Defendant, he contacted Special Agent Mayer so she could continue her investigation into Defendant's former wife's allegations of human trafficking – allegations which did not result in any criminal charges.  There is no evidence that Special Agent Othic and other agents designed a plan or scheme to keep Defendant in civil custody pending any criminal investigation.  As explained above, Defendant has not proven, or even provided any evidence, that the primary or exclusive purpose of the civil detention was to hold him for future criminal prosecution.  And, as in the cases cited above, ICE had its own reasons to detain Defendant.

For the foregoing reasons, Defendant's first motion to dismiss should also be DENIED.

/s/Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 16th day of May, 2013.